# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADAM J. NELSON, | Case No.  1:19-cv-01387-SAB |
| Plaintiff, | ORDER DENYING PLAINTIFF'S SOCIAL SECURITY APPEAL AND ENTERING JUDGMENT IN FAVOR OF THE COMMISSIONER OF SOCIAL SECURITY |
| v. | |
| COMMISSIONER OF SOCIAL SECURITY, | (ECF Nos. 23, 25) |
| Defendant. | |

## I.

## INTRODUCTION

Plaintiff Adam J. Nelson ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for disability benefits pursuant to the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]

For the reasons set forth below, Plaintiff's Social Security appeal shall be denied.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff protectively filed an application for a period of disability and disability insurance

---

[1] The parties have consented to the jurisdiction of the United States magistrate judge and the case has been reassigned to the magistrate judge for all purposes.  (See ECF Nos. 8, 11, 26.)

benefits and a Title XVI application for supplemental security income on September 1, 2016. (AR 131, 132.)  Plaintiff's applications were initially denied on March 17, 2017, and denied upon reconsideration on June 23, 2017.  (AR 173-177, 181-185.)  Plaintiff requested and received a hearing before Administrative Law Judge Diane S. Davis ("the ALJ").  Plaintiff appeared for a hearing on March 6, 2019.  (AR 47-79.)  On June 10, 2019, the ALJ found that Plaintiff was not disabled.  (AR 18-39.)  The Appeals Council denied Plaintiff's request for review on August 26, 2019.  (AR 1-3.)

Plaintiff filed this action on October 3, 2019.  (ECF No. 1.)  The administrative record was filed on February 26, 2020.  (ECF No. 13.)  Plaintiff filed his opening brief on June 25, 2020, and filed an amended opening brief on June 29, 2020.  (ECF No. 21, 22.)  The Commissioner filed an opposition to Plaintiff's opening brief on July 29, 2020.  (ECF No. 23.)  On August 31, 2020, Plaintiff's amended opening brief was stricken from the record for being unsigned and Plaintiff filed a signed amended opening brief.  (ECF Nos. 24, 25.)  Plaintiff did not file a reply.  The matter is now deemed submitted on the pleadings.

## A.    Hearing Testimony

Plaintiff appeared with counsel and testified at the March 6, 2019 hearing.  (AR 52-72.) At the hearing, Plaintiff amended his alleged onset date to January 20, 2015.  (AR 52.)  On the date of the hearing, Plaintiff was forty years old.  (AR 52.)  He had completed some junior college.  (AR 52.)  Plaintiff worked as a loan officer.  (AR 52.)  He would take calls from clients looking to refinance their homes and work with them to create the best loan for their circumstances.  (AR 53.)  He saw the loan process through from start to finish.  (Id. at 53.) Immediately prior to that Plaintiff had been a bank teller.  (AR 53.)

While working as a loan officer, Plaintiff had to lift file boxes that might weigh thirty pounds if they were full.  (AR 53.)  There was not much lifting when he was a bank teller.  (AR 53.)  He would sit at his window and the job was a mixture of sitting and standing and they were allowed to transition from sitting to standing.  (AR 53.)  As a loan officer, Plaintiff mostly sat. (AR 54.)  He would stand and walk to the processing department, underwriting departments and managers meetings so there was quite a bit of walking.  (AR 54.)  Plaintiff worked as an

independent contractor for his brother-in-law's mortgage company in 2005 and 2006.  (AR 54.)
He was doing loan officer duties.  (AR 54.)  Plaintiff's last job was a collator.  (AR 54.)  He
would go through boxes of files and remove staples, unbend corners, and run the documents
through a system to digitize them.  (AR 55.)  Plaintiff took the job because he was promised it
would not be labor intensive, but they kept him in the warehouse and he just could not do it
because he was unable to lift the boxes.  (AR 55.)

Plaintiff is unable to work because it is difficult for him to get around and it is hard for
him to sit for a long time without being uncomfortable.  (AR 55.)  The pain makes it difficult for
him to concentrate.  (AR 55.)  During the end of his time with his last job, Plaintiff noticed that
he was messing up his files, he was not focused.  (AR 55.)  He was losing some clients and was
missing a lot of days due to extreme pain.  (AR 55.)

Plaintiff is able to sit for minutes, maybe twenty minutes, he cannot stand for much
longer than a couple minutes.  (AR 56.)  Plaintiff is constantly in pain.  (AR 56.)  Plaintiff can
lift and carry fifteen to twenty pounds.  (AR 56.)  He can lift more than that if he is not moving
around.  (AR 56.)  Plaintiff supposes that he has some days that are better than others.  (AR 57.)
On a bad day, Plaintiff does not want to get out of bed.  (AR 57.)  The pain radiates throughout
his back.  (AR 57.)  It starts in his spine and goes down the backs of his legs and into his feet.
(AR 57.)  He has difficulty getting to the bathroom during the night so had to put a portable toilet
by his bed to make it easier.  (AR 57.)  There are also good days where he gets up and goes
outside.  (AR 57.)

Plaintiff will wake up and eat a simple breakfast, like cereal.  (AR 58.)  He takes his
medication.  (AR 58.)  He is living on his aunt's equine therapy ranch and there are six horses on
her property.  (AR 58.)  After breakfast, he will go outside and sit with the horses and meditate.
(AR 58.)  He will try and do the horse work that his aunt does.  (AR 58.)  Then he will eat lunch
and take his medication.  (AR 58.)  He will watch television or read and his aunt makes dinner.
(AR 58.)  He will have dinner, take his medication, and watch some television before he goes to
bed.  (AR 58.)  He does lots of meditation type stuff with the horses.  (AR 58.)  The horses will
come up and rub your knees or your feet with their noses.  (AR 59.)  He does not do any manual

1 | labor, but is present with them.  (AR 59.)

2       Plaintiff has some issues with depression and anxiety because it is tough not being able to
3 | take care of yourself when you are a grown up.  (AR 59.)  His condition has gotten worse since
4 | birth.  (AR 59.)  It gets worse and worse and it is depressing thinking about that it is not going to
5 | get better.  (AR 59.)  Plaintiff gets some physical therapy, but his Medicaid will only cover a
6 | certain amount and it gets used up pretty quickly just from going once a week.  (AR 59.)  He is
7 | not getting physical therapy now because he cannot afford it.  (AR 59.)  The physical therapy is
8 | helpful because they manually stretch him to get him more flexibility.  (AR 60.)  There is not
9 | much other treatment available.  (AR 60.)  His combination of spina bifida and spastic
10 | paraparesis is not something that has been documented much and they do not have a standard
11 | treatment for it.  (AR 60.)

12       Plaintiff was let go from his last job for missing too many days of work because it was
13 | tough for him to get out of bed.  (AR 60.)  He was not abusing medication or narcotics or drugs
14 | at that time.  (AR 60-61.)  Plaintiff is not currently abusing drugs.  (AR 61.)  He is only taking
15 | Hydrocodone that was prescribed to him.  (AR 61.)  When he was living with his aunt he was
16 | prescribed Norco, but she did not want him to take it.  (AR 61.)  She wanted him to use the horse
17 | healing work instead of medication.  (AR 61.)  He is now taking the Norco.  (AR 61.)

18       Plaintiff is not using cocaine but tried it when he was a teenager.  (AR 61.)  He was not
19 | using cocaine in 2015.  (AR 61.)  When Plaintiff was asked about admitting to a consultative
20 | examiner that he was using cocaine, Plaintiff stated that was erroneous.  (AR 62.)  He was
21 | absolutely not using cocaine in 2015.  (AR 62.)

22       Plaintiff moved to Colorado to live on his aunt's equine therapy ranch because she
23 | thought it would be good for him.  (AR 62.)  He was not doing any type of work activity like
24 | mucking out the stalls or feeding or walking the horses.  (AR 62-63.)  When he told Dr. Possner
25 | that he was helping out around the ranch he was just doing some dishes and helping out around
26 | the house.  (AR 63.)  It is too hard for him to get out there with the horses and do heavy work
27 | like that.  (AR 63.)  His aunt has ranch hands that assist her on the ranch.  (AR 66.)

28       His mom drove him to Colorado from Bakersfield.  (AR 63.)  He just took his clothes and

1   some art supplies.  (AR 63.)  They drove in her truck.  (AR 63.)  Plaintiff does not have a car, but

2   he can drive.  (AR 63-64.)  He does not have a driver's license because it expired.  (AR 64.)  He

3   has not had a car in a while.  (AR 64.)  He did not help with the driving to Colorado because he

4   is not on his mom's insurance.  (AR 64.)  They drove thirteen hours in one day to get to

5   Colorado.  (AR 64.)  Plaintiff stayed in a back house at the ranch, like a studio.  (AR 64.)  It was

6   not attached to the main house and Plaintiff was staying there by himself.  (AR 64-65.)  He had a

7   kitchenette in the studio.  (AR 65.)  He could cook with a microwave, but could not do any real

8   cooking there.  (AR 66.)  He does not really cook himself but would help his aunt with the

9   cooking.  (AR 66.)

10          Plaintiff does a little bit of art.  (AR 66.)  He got some acrylics for his birthday and he

11   does abstract painting on canvas.  (AR 66.)  His aunt's partner is a really good painter and has

12   been helping him.  (AR 67.)  He has not played the guitar very much.  (AR 67.)  He had carpal

13   tunnel and has not been inspired to play that much.  (AR 67.)  His aunt's partner plays the guitar

14   and he was hoping to play with her, but that did not pan out.  (AR 67.)

15          Plaintiff had carpal tunnel surgery on both hands.  (AR 67.)  The right hand four weeks

16   prior and the left hand two weeks prior to the hearing.  (AR 67.)  They did not suggest that he

17   have physical therapy after the surgery.  (AR 67.)  He was not given any exercises, but was told

18   not to do any heavy lifting.  (AR 68.)  He had a follow up two days prior to the hearing and they

19   told him it looks like his hand is healing okay.  (AR 68.)  He was released by the doctor and does

20   not go back unless he has a severe problem.  (AR 68.)

21          Plaintiff had been using a crutch and knee brace since he sprained his knee a week ago.

22   (AR 68.)  He was going up some steps into his house and there was snow and he slipped and

23   twisted it.  (AR 69.)  He is using the knee brace and the crutch helps him to get around.  (AR 68.)

24   The doctor said it could be a torn ACL, but he thinks that it is just a sprain.  (AR 68.)  The doctor

25   examined Plaintiff and prescribed hydrocodone for thirty days.  (AR 69-70.)  Prior to spraining

26   his knee, the medication he was talking helped him with his pain.  (AR 70.)  It does not take the

27   pain away but makes it easier to tolerate.  (AR 70.)  Plaintiff had surgery on his feet when he was

28   thirteen years old and has had excruciating pain every day since then.  (AR 70.)  The root of his

1    problem is his spine where the pain starts, but his feet hurt the most.  (AR 71.)

2          Plaintiff has received cortisone injections for his ankles.  (AR 71.)  He tried for two to

3    three months, but it did not give him any reprieve at all.  (AR 71.)  They mentioned giving him a

4    Baclofen pump, but he had to try the oral medication first and it did not give him enough benefit

5    to agree to having a pump implanted in him.  (AR 71.)  Plaintiff does not have any units to do

6    physical therapy at this time.  (AR 72.)  The physical therapy does help.  (AR 72.)  It does not

7    help the pain, but helps to loosen him up a little bit.  (AR 72.)  Plaintiff tried a TENS unit, but it

8    did not help.  (AR 72.)

9          Magnussen, a vocational expert ("VE"), also testified at the hearing.  (AR 73-76.)  The

10   VE described Plaintiff's past work as a loan officer, 186.267-017, sedentary, 7.  (AR 74.)

11         The ALJ presented a hypothetical of an individual of Plaintiff's age, education, and work

12   experience who can perform work at the sedentary level (lift and carry 10 pounds occasionally

13   and less than 10 pounds frequently; can stand and/or walk two total hours in an eight hour work

14   day; and sit about six hours total) and can occasionally stoop, kneel, crouch, crawl, and climb

15   ramps and stairs.  (AR 74.)  The individual can occasionally push and/or pull with the bilateral

16   lower extremities.  (AR 74-75.)  The individual can never climb ladders, ropes, or scaffolds.

17   (AR 75.)  He can never work at unprotected heights or around dangerous, unprotected, moving

18   major manufacturing machinery.  (AR 75.)  The VE opined that this individual could perform

19   Plaintiff's past work as a loan officer.  (AR 75.)

20         The ALJ presented a second hypothetical of this same individual with the additional

21   limitations that they could only stand and/or walk for less than two hours in an eight hour work

22   day and were limited to frequent handling, reaching, feeling, and fingering bilaterally.  (AR 75.)

23   The VE opined that this individual would be able to perform Plaintiff's past work as a loan

24   officer.  (AR 75.)

25         The ALJ presented a third hypothetical of that same individual if a sit/stand option was

26   required to allow the individual to alternate positions as needed.  (AR 75.)  The VE opined that

27   this individual would be able to perform Plaintiff's past work.  (AR 75.)

28         The VE presented a fourth hypothetical of an individual who would be off work fifteen

percent or more in a work day.  (AR 75.)  The VE opined that Plaintiff's past work would not remain under this hypothetical.  (AR 75.)

### B.   ALJ Findings

The ALJ made the following findings of fact and conclusions of law.

- Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2018.

- Plaintiff not engaged in substantial gainful activity since the alleged onset date of January 20, 2015.

- Plaintiff has the following severe impairments: spastic paraparesis and spina bifida.

- Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.

- Plaintiff has the residual functional capacity to perform sedentary work as defined in 20 CFR §§ 404.1567(a) and 416.967(a), except Plaintiff can occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs.  Plaintiff can occasionally push and/or pull with the bilateral lower extremities. Plaintiff can never climb ladders, ropes, or scaffolds.  He can never work at unprotected heights or around dangerous, unprotected, moving major manufacturing machinery.

- Plaintiff is capable of performing past relevant work as a loan officer (DOT 186.267-018, SVP 7, sedentary).  This work does not require the performance of work related activities precluded by Plaintiff's residual functional capacity.

- Plaintiff has not been under a disability as defined in the Social Security Act from January 20, 2015, through the date of this decision.

(AR 24-39.)

### III.

### LEGAL STANDARD

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that he is unable "to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five step sequential evaluation process to be used in determining if a claimant is disabled. 20 C.F.R. § 404.1520;[2] Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194 (9th Cir. 2004). The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

> Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.
>
> Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not disabled.
>
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.
>
> Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.
>
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g). In reviewing findings of fact in respect to the denial of benefits, this court "reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error." Hill v. Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012). "Substantial evidence" means more than a scintilla, but less than a preponderance. Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996)

---

[2] The cases generally cited herein reference the regulations which apply to disability insurance benefits, 20 C.F.R. §404.1501 et seq., however Plaintiff is also seeking supplemental security income, 20 C.F.R. § 416.901 et seq. The regulations are generally the same for both types of benefits. Therefore, further references are to the disability insurance benefits regulations, 20 C.F.R. §404.1501 et seq.

1   (internal quotations and citations omitted).   "Substantial evidence is relevant evidence which,

2   considering the record as a whole, a reasonable person might accept as adequate to support a

3   conclusion."   Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of

4   Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

5   "[A] reviewing court must consider the entire record as a whole and may not affirm

6   simply by isolating a specific quantum of supporting evidence."   Hill, 698 F.3d at 1159 (quoting

7   Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006).   However, it is not

8   this Court's function to second guess the ALJ's conclusions and substitute the court's judgment

9   for the ALJ's.   See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is

10  susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be

11  upheld.").

12                                            **IV.**

13                          **DISCUSSION AND ANALYSIS**

14          Plaintiff argues that the ALJ erred by 1) improperly weighing the medical evidence; 2)

15  improperly evaluating his symptom testimony 3) failing to find his depression was a severe

16  impairment at step two of the sequential evaluation process; 4) improperly determining that

17  Plaintiff did not meet or equal the listings at step three of the sequential evaluation process; 5)

18  made legal error by failing to obtain a medical expert opinion on whether Plaintiff met or

19  equaled a listing; 6) making findings that were based on error of facts and logic; and 7) that the

20  ALJ's determination is not based on the testimony of the vocational expert.   Plaintiff seeks to

21  have this matter reversed with an award of benefits.

22          **A.      Evaluation of Plaintiff's Symptom Testimony**

23          Plaintiff contends that the ALJ erred by improperly evaluating his pain testimony.

24  Plaintiff argues that the ALJ must consider the degenerative nature of his impairment and his

25  assertion that he gradually experienced worsening health problems that eventually became

26  disabling.   Plaintiff states that the ALJ cited the evidence that support his testimony and then

27  made improper credibility findings.

28          Defendant counters that there is no merit to Plaintiff's claims that the ALJ did not

properly evaluate his symptom testimony and that clear reasons were provided to reject the testimony that is supported by substantial evidence in the record.  Defendant argues that the ALJ found Plaintiff's symptom complaints were inconsistent with the objective findings in the medical record and he performed activities that were inconsistent with his stated limitations.

"An ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment."  Orn v. Astrue, 495 F.3d 625, 635 (9th Cir. 2007) (internal punctuation and citations omitted).  Determining whether a claimant's testimony regarding subjective pain or symptoms is credible, requires the ALJ to engage in a two-step analysis.  Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012).  The ALJ must first determine if "the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged."  Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal punctuation and citations omitted).  This does not require the claimant to show that his impairment could be expected to cause the severity of the symptoms that are alleged, but only that it reasonably could have caused some degree of symptoms.  Smolen, 80 F.3d at 1282.

Then "the ALJ may reject the claimant's testimony about the severity of those symptoms only by providing specific, clear, and convincing reasons for doing so."  Brown-Hunter v. Colvin, 806 F.3d 487, 488–89 (9th Cir. 2015).  "The ALJ must specifically make findings that support this conclusion and the findings must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony."  Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004) (internal punctuation and citations omitted).  Factors that may be considered in assessing a claimant's subjective pain and symptom testimony include the claimant's daily activities; the location, duration, intensity and frequency of the pain or symptoms; factors that cause or aggravate the symptoms; the type, dosage, effectiveness or side effects of any medication; other measures or treatment used for relief; functional restrictions; and other relevant factors.  Lingenfelter, 504 F.3d at 1040; Thomas, 278 F.3d at 958.  In assessing the claimant's credibility, the ALJ may also consider "(1) ordinary techniques of credibility evaluation, such as the

1   claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other

2   testimony by the claimant that appears less than candid; [and] (2) unexplained or inadequately

3   explained failure to seek treatment or to follow a prescribed course of treatment. . .."

4   Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting Smolen, 80 F.3d at 1284).

5   The district court is constrained to review those reasons that the ALJ provided in finding the

6   claimant's testimony not credible.  Brown-Hunter, 806 F.3d at 492.

7          The ALJ considered Plaintiff's November 15, 2016 Function Report.  (AR 28, 310-318.)

8   Plaintiff stated that he was not able to lift very much because he had no balance, it hurt his back,

9   and his legs shook.  (AR 28, 315.)  He could only walk across the street before he needed to rest,

10  did not want to move, and could not get out of bed anymore.  (AR 28, 310, 315.)  Plaintiff stated

11  that it hurt to walk and stand up which made him depressed.  (AR 28, 310.)  He had no problem

12  with his activities of daily living, but did not prepare any meals because he could not stand up

13  long enough to cook.  (AR 28, 310.)  Plaintiff did no chores, housework, or yardwork because it

14  hurt his back and feet.  (AR 28, 313.)  He went outside the house once or twice a week, and was

15  able to go out alone.  (AR 28, 313.)  He did not have a driver's license and did not go shopping.

16  (AR 28, 313.)  He did not spend time with others and did not go anywhere.  (AR 28, 314.)  He

17  had no problems getting along with friends, family, neighbors and others or authority figures.

18  (AR 28, 313, 316.)  Plaintiff could pay attention for twenty minutes, sometimes finished what he

19  started, and could follow written and spoken instructions.  (AR 28, 315.)  He did not handle

20  stress well, but handles changes in routine pretty well.  (AR 28, 317.)  He had been prescribed

21  braces for ambulation and was scared of groups of people watching him try to walk.  (AR 28,

22  316.)

23         At the hearing, Plaintiff testified that it was difficult for him to get around at work.  (AR

24  28, 55.)  He has trouble sitting for a long time and the pain makes it difficult for him to focus.

25  (AR 28, 55.)  He can sit for twenty minutes before he needs to stand up for a couple of minutes.

26  (AR 28, 56.)  After standing he is still in pain.  (AR 28, 56.)  Plaintiff can lift fifteen to twenty

27  pounds, but has difficulty carrying more.  (AR 28, 56.)  On bad days, he does not want to get out

28  of bed.  (AR 28, 57.)  The pain radiates throughout his back, starting in his spine and going down

1   his legs to his feet.  (AR 28, 57.)  He has missed work due to bad days and on a good day he can

2   get up and go outside.  (AR 28, 57, 60.)  He is living at his aunt's equine therapy ranch.  (AR 28,

3   58.)  He has problems with anxiety and depression.  (AR 28, 59.)  He participates in physical

4   therapy, which helps, but has a limited number of sessions with Medicaid.  (AR 28-29, 59.)  He

5   was not in physical therapy at the time of hearing because he had maxed out on his sessions.

6   (AR 29, 59.)

7            Plaintiff last worked as loan officer and was let go for missing too many days because he

8   had trouble getting out of bed.  (AR 29, 60.)  Plaintiff stated that he was not abusing medication

9   or drugs at this time, and only uses Norco.  (AR 29, 60-61.)  In a 2015 consultative examination,

10   Plaintiff admitted to using cocaine,[3] however he testified that he was not using cocaine in 2015.

11   (AR 29, 62.)  His work on the horse ranch does not involve working with the horses, but he helps

12   with dinner, the dishes, etc.  (AR 29, 63.)

13            When he moved to Colorado, his mother drove him.  (AR 29, 63.)  The trip took fifteen[4]

14   hours and they did it in one day.  (AR 29, 64.)  Plaintiff does not have a driver's license or drive

15   a car.  (AR 29, 63-64.)  Plaintiff helps his aunt with the cooking and does some painting.  (AR

16   29, 66.)  He plays the guitar but has not played much lately.  (AR 29, 67.)  He just had carpal

17   tunnel surgery on his right hand four weeks ago and on his left hand two weeks ago.  (AR 29,

18   67.)  The surgery is healing okay and he has not been prescribed physical therapy.  (AR 29, 67-

19   68.)  Plaintiff was using a crutch at the hearing because he had sprained his knee two weeks

20   prior.  (AR 29, 68.)  Before the knee sprain, his medication helped with his pain but did not

21

---

22   [3] At the January 31, 2015 comprehensive examination, Dr. Nickell reported:

23        The claimant reports history of substance abuse beginning at the age of 14 when he began to use
         acid and other hallucinogenic drugs.  When asked how often he used, he said. "A lot."  He states

24        he used cocaine and used every other kind of drug.  Last use of drugs was 13-14 months ago when
         he used Vicodin which was not prescribed for him.  He states he also most recently used cocaine.

25        He denies any substance abuse treatment programs and has not attended AA Alcoholics
         Anonymous or NA Narcotics Anonymous.

26   (AR 474.)

27   [4] Plaintiff actually testified that it took them 13 hours to drive to Colorado.  (AR 64.)  This appears to be a
     typographical error as the ALJ recognizes in the opinion that Plaintiff drove 13 hours to get to Colorado.  (AR 33,

28   38.)

1  eliminate it.  (AR 29, .)  The medication reduced the pain and made it easier to tolerate.  (AR 29,

2  70.)  Plaintiff's pain starts in his spine, but the worst pain is in his feet.  (AR 29, 71.)  He had

3  cortisone injections in his ankles that did not help.  (AR 29, 71.)

4          The ALJ found that Plaintiff's medically determinable impairments could reasonably be

5  expected to cause the symptoms alleged, but that his statements concerning the intensity,

6  persistence, and limiting effects of his symptoms were not entirely consistent with the medical

7  evidence and the other evidence in the record for the reasons explained in the decision.  (AR 29.)

8          The ALJ found that Plaintiff's statements about the intensity persistence and limiting

9  effects of his symptoms are inconsistent with the medical evidence of record.  (AR 29.)  Based

10  on the medical evidence, Plaintiff's spastic paraparesis and spina bifida would reasonably limit

11  him to sedentary work.  (AR 29.)  But his physical examinations and reported activities of daily

12  living, which include his ability to sit through a 40 minute hearing and testimony that he was

13  able to drive 13 hours in one day as a passenger when relocating from California to Colorado, do

14  not support his assertion that he cannot sit more than 20 minutes at a time or two hours in a

15  workday.  (AR 29.)  Further, the ALJ found that the record does not support any manipulative

16  limitations.  (AR 29.)  The ALJ also found that Plaintiff's lack of mental health treatment,

17  normal mental status examination results, and the opinion evidence does not support a finding

18  that his depression is severe.  (AR 29.)

19          In conclusion, the ALJ found:

20          The claimant's spastic paraparesis and spina bifida reasonably limit him to
            sedentary work with postural and environmental limitations.  However, the
21          claimant's physical examinations and reported activities of daily living including
            his ability to sit through a 40 minute hearing and his testified ability to drive 13
22          hours in one day as a passenger does not support his assertion that he cannot sit
            more than 20 minutes at a time or two hours in a workday.  The medical report
23          indicating that he was recently able to stand for an hour or so does not support a
            finding that he can stand less than two hours in a workday.  Nor does the record
24          and the claimant's testimony that he still occasionally paints and plays guitar at
            least prior to his carpal tunnel surgery support any manipulative limitations.
25          Additionally, the claimant's lack of mental health treatment, normal mental status
            examination results, and opinion evidence does not support a finding that the
26          claimant's depression is a severe impairment.

27  (AR 38.)

28  ///

1    1.    Activities of Daily Living

2    The ALJ found that Plaintiff's activities of daily living were inconsistent with his

3  symptom testimony.   There are two grounds to use daily activities for an adverse credibility

4  finding.  Orn, 495 F.3d at 639.  First, daily activities can form the basis of an adverse credibility

5  determination if the claimant's activity contradicts his testimony.  Id.  Secondly, "daily activities

6  may be grounds for an adverse credibility finding 'if a claimant is able to spend a substantial part

7  of his day engaged in pursuits involving the performance of physical functions that are

8  transferable to a work setting.' "  Id. (quoting Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)).

9  Here, the ALJ found that Plaintiff's reported activities contradicted his testimony.

10    The ALJ noted that Plaintiff testified that he was only able to sit for twenty minutes

11  before he needs to stand up for a couple of minutes.  (AR 28, 56.)  However, Plaintiff testified

12  that he was able to be in a car as a passenger for 13 hours in one day when he was relocating

13  from California to Colorado which is inconsistent his assertion that he cannot sit more than 20

14  minutes at a time or two hours in a workday.  (AR 29, 56, 64.)

15    Further, in the opinion, the ALJ considered that on June 15, 2018, Plaintiff reported to

16  Dr. Possner that he was on his feet more as he was trying to help his family around the ranch.

17  (AR 30, 380.)  On July 30, 2018, he reported to his physical therapist that he was pretty tight

18  after doing a lot at the ranch over the weekend.  (AR 30, 663.)  At his initial appointment with

19  the physical therapist on June 29, 2018, he reported his onset date as June 29, 2018, and stated

20  that prior to that he had been able to stand only an hour or so.  (AR 30, 663.)  But, since the onset

21  date he had only been able to stand two minutes before having significant pain.  (AR 30, 663.)

22    On January 20, 2015, Plaintiff reported to Dr. Siekerkotte that he could only walk for two

23  minutes before he needed to sit down and could only stand for one minute before he needed to

24  lean on something.  (AR 31, 465.)  Plaintiff reported that he could care for his personal needs,

25  vacuum, wash dishes, do laundry, and cook for a maximum of five minutes and could shop with

26  a cart provided.  (AR 31-32, 466.)

27    The ALJ properly considered Plaintiff's inconsistent statements about his activities of

28  daily living and substantial evidence supports the ALJ's finding that Plaintiff's symptom

1    testimony was not consistent with his stated activities.  Robbins, 466 F.3d at 884 (conflicting or

2    inconsistent statements can contribute to an adverse credibility finding); Light v. Soc. Sec.

3    Admin., 119 F.3d 789, 792 (9th Cir. 1997), as amended on reh'g (Sept. 17, 1997) (credibility

4    determination can be based on conflicts between the claimant's testimony and his own conduct,

5    or on internal contradictions in that testimony).

6           2.      Objective Medical Evidence

7           The ALJ also found that the lack of objective findings in the medical record was

8    inconsistent with Plaintiff's stated limitations.  The determination that a claimant's complaints

9    are inconsistent with clinical evaluations can satisfy the requirement of stating a clear and

10   convincing reason for discrediting the claimant's testimony.  Regennitter v. Commissioner of

11   Social Sec. Admin., 166 F.3d 1294, 1297 9th Cir. 1999).  The ALJ properly considered this

12   evidence in weighing Plaintiff's credibility.  "While subjective pain testimony cannot be rejected

13   on the sole ground that it is not fully corroborated by objective medical evidence, the medical

14   evidence is still a relevant factor in determining the severity of the claimant's pain and its

15   disabling effects."  Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001) (citing 20 C.F.R. §

16   404.1529(c)(2)).

17          Plaintiff argues that the ALJ erred by rejecting subjective pain testimony, but does not

18   address the ALJ's findings that Plaintiff's testimony regarding the severity of his mental

19   impairment is inconsistent with the objective medical evidence.  The ALJ found that Plaintiff's

20   lack of mental health treatment, his normal mental health examinations, and the opinion evidence

21   was inconsistent with his allegations of a severe mental impairment due to his depression.  (AR

22   29.)

23          The ALJ considered that during the hearing, aside from testifying that his physical pain

24   and limitations have caused depression, Plaintiff did not testify to any specific mental

25   limitations.  (AR 25.)  In his November 15, 2016 function report, Plaintiff stated that he had

26   difficulties with completing tasks and concentration, but that he had no problems following

27   instructions, can pay attention for twenty minutes and sometimes finishes what he starts.  (AR

28   25, 315.)  But, in a January 31, 2015, comprehensive psychiatric examination, Dr. Nikkel found

15

that found that Plaintiff's concentration was within normal limits; he was able to perform work activities on a consistent basis without special or additional instruction; had a good ability to maintain regular attendance in the workplace; and had a fair ability to complete a normal workday or workweek without interruption from a psychiatric condition.  (AR 25, 475, 477.)  In his February 13, 2017 mental examination, Dr. Schmidt found that Plaintiff's attention and concentration were within normal limits.  (AR 25, 620.)  The ALJ found that the objective evidence does not support Plaintiff's subjective complaints.  (25.)

The ALJ also considered that on August 2017, Plaintiff reported that he was feeling blue all the time, had difficulty falling asleep and unrestful sleep and was unable to stay asleep due to pain.  (AR 30, 678.)  But, on examination, Plaintiff was noted to be alert and oriented, recent memory was intact, and mood and affect were normal.  (AR 30, 679.)  At his next examination on September 15, 2017, examination results remained the same.  (AR 30, 675.)

On June 15, 2018, Plaintiff had an appointment with Dr. Possner and complained that his pain interfered with his sleep.  (AR 30.)  His PHDQ score was 11 which indicated moderate depression.  (AR 30.)  Plaintiff stated that his depression was more pain related and he was told to make a separate appointment to address the issue if he felt that there was underlying depression.  (AR 30.)  However, on examination, Plaintiff had intact memory, judgment and insight, and normal mood and affect.  (AR 30.)

On July 27, 2018, Dr. Possner found Plaintiff to have intact memory, judgment, and insight and normal mood and affect.  (AR 30, 655.)

On November 6, 2018, Plaintiff was seen for foot pain and reported a seven day headache.  (AR 31, 649.)  His mental status examination was normal with intact memory, judgment and insight, normal mood and affect, and speech had normal rate and tone.  (AR 31, 649.)

The ALJ also considered that in October 2015, Plaintiff complained of chronic depression.  (AR 31, 496.)  Plaintiff was found to be depressed, but on examination he had logical thought process, normal thought content, average intelligence, normal insight, and his judgment was impaired ability to make reasonable decisions within normal limits.  (AR 31, 498.)

1    Plaintiff had a consultative mental status examination by Dr. Nikkel on January 31, 2015,

2  and reported a steady build-up of mental health symptoms since 2010 or 2011.  (AR 33, 472.)

3  The mental status examination was within normal limits.  (AR 33, 474-476.)  Plaintiff's affect

4  was depressed, but his memory was intact on all tests, and concentration was within normal

5  limits.  (AR 33, 475.)

6    On February 13, 2017, Dr. Schmidt conducted a consultative examination and Plaintiff

7  reported that he was taking Wellbutrin for his depression, but only as needed.  (AR 34, 615.)  Dr.

8  Schmidt found Plaintiff to be marginally polite, and he was cooperative with the process but

9  minimally responsive to questions, especially those that delved into specific detailed

10  information.  (AR 35, 619.)  Plaintiff's mood was mildly depressed but not significantly

11  impacting his behavior and he showed an inappropriate sense of humor that appeared

12  inconsistent with major depression.  (AR 35, 619.)  Dr. Schmidt found Plaintiff to be engaged in

13  impression management and his presentation appeared inconsistent with his over endorsement of

14  major depressive disorder.  (AR 35, 619.)  On mental examination, thought content was within

15  normal limits.  (AR 36, 620.)  Plaintiff's memory all appeared intact and functional and his fund

16  of knowledge and attention/concentration were within normal limits.  (AR 36, 620.)  Cognitive

17  thinking was intact, at least at the concrete level of reasoning.  (AR 36, 620.)  Dr. Schmidt found

18  that Plaintiff responded appropriately to conversational banter, but that he was actively engaged

19  in impression management.  (AR 36, 620.)

20    The ALJ properly considered that Plaintiff's symptom testimony was inconsistent with

21  the clinical evaluations in the medical record.  "Contradiction with the medical record is a

22  sufficient basis for rejecting the claimant's subjective testimony."  Carmickle v. Comm'r, Soc.

23  Sec. Admin., 533 F.3d 1155, 1161 (9th Cir. 2008).

24    3.    ALJ's Observations

25    Citing to Archer v. Apfel, 66 F.App'x 121, 122 (9th Cir. 2003), Plaintiff argues that the

26  ALJ erred by based on the "sit and squirm" test.  In Archer, the ALJ relied on the claimant's

27  demeanor during the hearing to discredit the claimant's pain testimony, which the Ninth Circuit

28  found provided little if any support to discredit his testimony.  66 F.App'x at 122.  However,

1   here, the ALJ did not rely on Plaintiff's demeanor during the hearing to discredit his pain

2   testimony.  In this instance, the ALJ noted that Plaintiff had testified that he could only sit for

3   twenty minutes, but that he was able to sit through the forty minute hearing.  (AR 29.)

4        The ALJ's observations of Plaintiff's functioning may not form the sole basis for

5   discrediting his testimony.  Orn, 495 F.3d at 639; Tonapetyan v. Halter, 242 F.3d 1144, 1148

6   (9th Cir. 2001).  But the "ALJ's personal observations may be used only in 'the overall

7   evaluation of the credibility of the individual's statements.' "  Orn, 495 F.3d at 639 (quoting

8   S.S.R. 96–7p at 8.)  The ALJ properly considered that during the hearing Plaintiff was able to sit

9   for forty minutes which contradicted his testimony that he could only sit for twenty minutes.

10  Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999).

11       The ALJ provided clear and convincing reasons to discredit Plaintiff's symptom

12  testimony that are supported by substantial evidence in the record.

13       **B.      Non-Severe Mental Finding at Step Two**

14       Plaintiff argues that the ALJ erred by failing to find his depression to be a severe

15  impairment at the second step in the sequential evaluation process.  Plaintiff contends that his

16  Global Assessment of Function ("GAF") scores support that his mental impairment is severe.

17  Further, Plaintiff argues that he should not be chastised for his failure to seek mental health

18  treatment because it is not probative on whether he has a mental impairment and the treatment

19  notes that are present indicate a serious problem with depression and stress.

20       Defendant counters that the ALJ properly found that Plaintiff's mental limitations singly

21  or in combination do not cause more than a minimal limitation on his ability to perform work

22  activities.  Defendant contends that the treatment record and opinions evidence is consistent with

23  the ALJ's finding that Plaintiff's mental limitations are not severe.  Further, Defendant argues

24  that even if the ALJ erred by failing to find that Plaintiff had a severe mental impairment, any

25  error was harmless because the ALJ did evaluate Plaintiff's limitations due to his depressive

26  disorder later in the decision.

27       "An impairment or combination of impairments can be found 'not severe' only if the

28  evidence establishes a slight abnormality that has 'no more than a minimal effect on an

individual['s] ability to work.' "  Smolen, 80 F.3d at 1290 (citations omitted).  Step two is a "de minimis screening devise to dispose of groundless claims."  Id.  An ALJ can only find that claimant's impairments or combination of impairments are not severe when his conclusion is clearly established by medical evidence.  Webb v. Barnhart, 433 F.3d 683, 687 (9th Cir. 2005) (quoting S.S.R. 85-28).  In considering an impairment or combination of impairments, the ALJ must consider the claimant's subjective symptoms in determining their severity.  Smolen, 80 F.3d at 1290.

Here, the ALJ found that Plaintiff did not have a severe mental impairment, but she did go on to address his mental limitations in determining Plaintiff's residual functional capacity. Accordingly, even assuming that the ALJ erred at step two, any such error would be harmless. Any error in failing to find impairment severe at step two is harmless where the ALJ considers the limitations posed by the impairment in the step four analysis.  Lewis v. Astrue, 498 F.3d 909, 911 (9th Cir. 2007); see also Buck v. Berryhill, 869 F.3d 1040, 1049 (9th Cir. 2017) (Where the ALJ ultimately decided step two in the claimant's favor, she "could not possibly have been prejudiced" at this stage of the analysis.).

## C.    Step Three

Plaintiff contends that the ALJ erred in finding that his impairments did not met or equal a listing at step three.  Plaintiff argues that he met listings 1.02(a), 11.07, 11.08, and 11.13. Plaintiff asserts that the ALJ erroneously found that his disorganizations of both legs and ankles did not result in an extreme limitation in his ability to stand up from a seated position or balance when walking or standing, but the record is replete with evidence of his inability to ambulate effectively.  Further, Plaintiff contends that because he does not want to use a hand-held assistive device does not mean that he does not need to use one.

Defendant counters that Plaintiff did not meet his burden to establish that his physical impairments met or equaled a presumptively disabling listed impairment.  Defendant argues that Plaintiff merely states that he meets listings 1.02(a), 11.07, 11.08, and 11.13 without explaining the criterial for the listings or how he met or equaled those listings.  Defendant contends that Plaintiff waived this argument when he did not present any evidence to the appeals counsel that

he met or equaled the listings.  Further, Defendant argues that substantial evidence supports the ALJ's finding because to meet listing 1.02(a) would require an inability to ambulate effectively without the use of a hand-held assistive device that limits the use of both arms, such as a walker or two canes.  Listings 11.07, 11.08, and 11.13 all require a disorganization of motor function in two extremities that results in needing a two handed assistive device to stand up from a seated position or balance while walking; or being unable to pinch, manipulate or otherwise use your fingers, hands, or arms.  Since Plaintiff does not need a two handed device nor does he have any limitations on the use of his hands, arms, or fingers, he does not meet the listings.

At Step Three the ALJ considers if the claimant has an impairment, or combination of impairments that meet or equal a listed impairment.  <u>Burch</u>, 400 F.3d at 679.  "An ALJ must evaluate the relevant evidence before concluding that a claimant's impairments do not meet or equal a listed impairment.  A boilerplate finding is insufficient to support a conclusion that a claimant's impairment does not do so."  <u>Lewis v. Apfel</u>, 236 F.3d 503, 512 (9th Cir. 2001).  However, the ALJ need not discuss the findings in any specific section of his opinion.  <u>Lewis</u>, 236 F.3d at 513.

"To meet a listed impairment, a claimant must establish that he or she meets each characteristic of a listed impairment relevant to his or her claim."  <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1099 (9th Cir. 1999).  No matter how severe an impairment is, it does not qualify as equaling a listing where it manifests only some of the listing criteria.  <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530 (1990).

Equivalence may be determined if the claimant has multiple impairments none of which meets the listing requirement, but which when viewed in the aggregate are equivalent to a listed impairment.  <u>Burch</u>, 400 F.3d at 682.  In determining if a claimant's combination of impairment equals a listing the ALJ must consider his symptoms in combination and cannot fragment them in evaluating their effects.  <u>Lewis</u>, 236 F.3d at 513.  However, "[a]n ALJ is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence."  <u>Burch</u>, 400 F.3d at 683 (quoting <u>Lewis</u>, 236 F.3d at 514.)

1  "If the claimant meets or equals one of the listed impairments, a conclusive presumption

2  of disability applies." Marcia v. Sullivan, 900 F.2d 172, 174 (9th Cir. 1990).

3       Plaintiff argues that the ALJ erred because she erroneously found that his disorganization

4  of both legs did not result in an extreme limitation on his ability to stand up from a seated

5  position or to balance or stand while walking.  Plaintiff argues, without citing to any evidence,

6  that the record is replete with evidence of his inability to ambulate effectively.  But "[t]o equal a

7  listed impairment, a claimant must establish symptoms, signs and laboratory findings 'at least

8  equal in severity and duration' to the characteristics of a relevant listed impairment, or, if a

9  claimant's impairment is not listed, then to the listed impairment 'most like' the claimant's

10 impairment." Tackett, 180 F.3d at 1099 (quoting 20 C.F.R. § 404.1526).  "Medical equivalence

11 must be based on medical findings." Tackett,  180 F.3d at 1100 (quoting 20 C.F.R. § 404.1526).

12      Under the listings for musculoskeletal disorders, an "[i]nability to ambulate effectively

13 means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very

14 seriously with the individual's ability to independently initiate, sustain, or complete activities.

15 Ineffective ambulation is defined generally as having insufficient lower extremity functioning

16 (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s)

17 that limits the functioning of both upper extremities."  20 C.F.R. § Pt. 404, Subpt. P, App. 1.

18      Under the Listing for neurological disorders,

19  Extreme limitation means the inability to stand up from a seated position,
    maintain balance in a standing position and while walking, or use your upper
20  extremities to independently initiate, sustain, and complete work-related
    activities.  The assessment of motor function depends on the degree of
21  interference with standing up; balancing while standing or walking; or using the
    upper extremities (including fingers, hands, arms, and shoulders).
22  a.  Inability to stand up from a seated position means that once seated you are
    unable to stand and maintain an upright position without the assistance of another
23  person or the use of an assistive device, such as a walker, two crutches, or two
    canes.
24  b.  Inability to maintain balance in a standing position means that you are unable
    to maintain an upright position while standing or walking without the assistance
25  of another person or an assistive device, such as a walker, two crutches, or two
    canes.
26  c.  Inability to use your upper extremities means that you have a loss of function
    of both upper extremities (including fingers, wrists, hands, arms, and shoulders)
27  that very seriously limits your ability to independently initiate, sustain, and
    complete work-related activities involving fine and gross motor movements.
28  Inability to perform fine and gross motor movements could include not being able

to pinch, manipulate, and use your fingers; or not being able to use your hands, arms, and shoulders to perform gross motor movements, such as handling, gripping, grasping, holding, turning, and reaching; or not being able to engage in exertional movements such a lifting, carrying, pushing, and pulling.

20 C.F.R. § Pt. 404, Subpt. P, App. 1.

Here, although there is evidence that Plaintiff requested and received a prescription for a wheelchair on November 30, 2018, because it was difficult for him to walk (AR 647), the evidence in the record which the ALJ cited demonstrates that Plaintiff is able to stand up and ambulate without the use of an assistive device.

The ALJ found that Plaintiff did not meet Listing 11.07 because he does not have a disorganization of motor function in two extremities that resulted in an extreme limitation in the ability to stand up from a seated position, balance while standing or walking or use the upper extremities.  (AR 26.)  Plaintiff did not meet listing 11.08 "because he does not have: A) a complete loss of function persisting for 3 consecutive months after the disorder; or B) disorganization of motor function in two extremities resulting in an extreme limitation in the ability to stand up from a seated position, balance while standing or walking; or use the upper extremities persisting for 3 consecutive months after the disorder. . . ."  (AR 27.)

The ALJ found that Plaintiff has disorganization of motor function in the bilateral motor extremities, but it was not extreme as required by the Listing.  (AR 27.)  The ALJ considered that Plaintiff had been prescribed a wheelchair on November 30, 2018, but does not indicate that he uses it and he did not use it at the March 16, 2019 hearing.  (AR 27.)  He was using a brace and crutch at the hearing, but stated that he had only been using the crutch since he had sprained his knee when he slipped on snow one week prior to the hearing.  (AR 27, 68-69.)  Further, the ALJ considered that in 2015 Plaintiff told Dr. Siekerkotte that he did not use a cane to assist with balance (AR 476); and informed Dr. Schmidt in 2017 that at no time has he used any support aides such as a cane, crutch, walker or wheelchair (AR 616); and Dr. Schmidt observed that Plaintiff arose from the armless chair at the end of the interview with no suggestion of physical pain.  (AR 27, 619).  Further, on February 23, 2019, Dr. Possner did not indicate that Plaintiff required the use of an assistive device to ambulate.  (AR 703-705.)

1    The ALJ's finding that Plaintiff did not need to use an assistive device to ambulate and

2  was able to rise from a seated position without assistance is supported by substantial evidence in

3  the record.  Here, Plaintiff argues that he meets the listing, but "[a] generalized assertion of

4  functional problems is not enough to establish disability at step three."  Tackett, 180 F.3d at

5  1100.  Plaintiff has failed to point to any evidence to contradict the ALJ's finding that he does

6  not meet or equal one of the Listings.

7    **D.    Failure to Develop the Record**

8    Plaintiff contends that the ALJ erred by failing to obtain a medical expert opinion

9  because there is no medical listing for Plaintiff's impairment.  Plaintiff argues that the ALJ could

10  not make a finding that Plaintiff did not equal a listing without a medical opinion.  Defendant

11  argues that the Hallex that Plaintiff relies on only applies provides for procedures for the ALJ to

12  follow if she decides that more information is needed from a medical source.

13    When applying for disability benefits, the claimant has the duty to prove that he is

14  disabled.  42 U.S.C. § 423(c)(5)(A).  The ALJ has an independent "duty to fully and fairly

15  develop the record and to assure that the claimant's interests are considered."  Widmark v.

16  Barnhart, 454 F.3d 1063, 1068 (9th Cir. 2006) (quoting Brown v. Heckler, 713 F.2d 441, 443

17  (9th Cir. 1983)).  The ALJ has a duty to further develop the record where the evidence is

18  ambiguous or the ALJ finds that the record is inadequate to allow for proper evaluation of the

19  evidence.  Mayes v. Massanari, 276 F.3d 453, 459-60 (9th Cir. 2001); Tonapetyan, 242 F.3d at

20  1150.  Further, the ALJ's duty to fully develop the record is heightened where the claimant may

21  be mentally disabled and, therefore, unable to protect his own interests.  Higbee v. Sullivan, 975

22  F.2d 558, 562 (9th Cir. 1992).  He must be especially diligent in ensuring that favorable as well

23  as unfavorable facts and circumstances are elicited."  Higbee, 975 F.2d at 561 (quoting Cox v.

24  Califano, 587 F.2d 988, 991 (9th Cir. 1978)).

25    A specific finding of ambiguity or inadequacy in the record is not required to trigger the

26  necessity to further develop the record where the record itself establishes the ambiguity or

27  inadequacy.  McLeod v. Astrue, 640 F.3d 881, 885 (9th Cir. 2011).  Here, Plaintiff was

28  represented by counsel during the hearing, and Plaintiff points to no ambiguity or inadequacy in

the record.  Further, the facts in this case are not similar to other instances in which the ALJ was found to have a duty to further develop the record.  See Tonapetyan, 242 F.3d at 1150-51 (ALJ erred by relying on testimony of physician who indicated more information was needed to make diagnosis); McLeod, 640 F.3d at 887 (ALJ erred by failing to obtain disability determination from the Veteran's Administration); Bonner v. Astrue, 725 F.Supp.2d 898, 901-902 (C.D. Cal. 2010) (ALJ erred where failed to determine if claimant's benefits were property terminated or should have been resumed after his release from prison); Hilliard v. Barnhart, 442 F.Supp.2d 813, 818-19 (N.D. Cal. 2006) (ALJ erred by failing to develop record where he relied on the opinion of a physician who recognized he did not have sufficient information to make a diagnosis).

In this instance, the ALJ pointed to specific evidence in the record that demonstrated that Plaintiff was able to ambulate without an assistive device and was able to stand from a seated position without assistance.  Plaintiff has not demonstrated that the ALJ erred by failing to further develop the record.

### E. Physician Opinion

Plaintiff asserts that the ALJ improperly weighed the opinions of Drs. Siekerkotte and Possner and their opinions do not support the residual functional capacity assessment.  Plaintiff argues that the ALJ erred because there is no evidence that he did not need an assistive device and these errors require remand.  Plaintiff contends that the record is replete with evidence to support Dr. Possner's opinion that Plaintiff needs to change positions every five minutes and needs to lie down several times per day and there is no evidence that would rebut the findings of the treating physician who is entitled to controlling weight.

Defendant counters that substantial evidence supports the ALJ's assessment of the medical evidence regarding Plaintiff's physical limitations.  Defendant argues that the opinions of the agency physicians, Dr. Mauro and Bugg are consistent with Plaintiff's ability to perform sedentary work and the ALJ gave them great weight because they are consistent with the evidence in the record.  Defendant also argues that there is substantial evidence in the record to support the weight given to the opinions of Drs. Siekerkotte and Dr. Possner.

1      The weight to be given to medical opinions depends upon whether the opinion is

2  proffered by a treating, examining, or non-examining professional. See Lester v. Chater, 81 F.3d

3  821, 830-831 (9th Cir. 1995). "Generally, the opinions of examining physicians are afforded

4  more weight than those of non-examining physicians, and the opinions of examining non-

5  treating physicians are afforded less weight than those of treating physicians. Orn, 495 F.3d at

6  631 (citing 20 C.F.R. § 404.1527(d)(1)-(2)). "If a treating or examining doctor's opinion is

7  contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and

8  legitimate reasons that are supported by substantial evidence." Garrison v. Colvin, 759 F.3d 995,

9  1012 (9th Cir. 2014) (citing 20 C.F.R. § 404.1527(d)(3)). The contrary opinion of a non-

10  examining expert is not sufficient by itself to constitute a specific, legitimate reason for rejecting

11  a treating or examining physician's opinion, however, "it may constitute substantial evidence

12  when it is consistent with other independent evidence in the record." Tonapetyan, 242 F.3d at

13  1149.

14      The opinions of Drs. Possner and Siekerkotte are contradicted by the opinions of Drs.

15  Mauro and Bugg, so the ALJ must provide specific and legitimate reasons to reject their

16  opinions. See Dominguez v. Colvin, 808 F.3d 403, 406-07 (9th Cir. 2015), as amended (Feb. 5,

17  2016) ("Under our precedent, if a treating doctor's opinion is contradicted by other medical

18  evidence in the record, the ALJ may reject this opinion only by 'providing specific and

19  legitimate reasons supported by substantial evidence.' " (quoting Bayliss v. Barnhart, 427 F.3d

20  1211, 1216 (9th Cir. 2005)).

21      1.    Dr. Possner

22      Plaintiff argues that the ALJ ignored evidence which is replete in the record that would

23  support Dr. Possner's opinion and there is absolutely no medical evidence in the record to rebut

24  his opinion. Plaintiff argues that since Dr. Possner's opinion is consistent with other substantial

25  evidence in the record it should be accorded controlling weight.

26      A treating physician's opinion is entitled to controlling weight on the issue of the nature

27  and severity of the claimant's impairment where it is well-supported by medically acceptable

28  clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial

1   evidence in the record.  20 C.F.R. § 404.1527(c)(2).  "If there is 'substantial evidence' in the

2   record contradicting the opinion of the treating physician, the opinion of the treating physician is

3   no longer entitled to 'controlling weight.' "   Orn, 495 F.3d at 632 (citing 20 C.F.R. §

4   404.1527(d)(2).

5        The ALJ considered the February 13, 2019 medical source statement completed by Dr.

6   Possner.  (AR 32-33, 703-705.)  Dr. Possner opined that Plaintiff could lift and carry less than 10

7   pounds occasionally and frequently; could stand and walk less than two hours in an 8-hour

8   workday; and sit less than two hours in an 8-hour workday.  (AR 32, 703.)  He must be able to

9   change positions at will every five minutes when sitting or standing walk around every hour for

10  five minutes.  (AR 32, 704.)  He must be able to lie down several times per day.  (AR 32, 704.)

11  He can never stoop, crouch, climb ladders, or balance, and can occasionally perform all other

12  postural activities.  (AR 32-33, 704.)  Plaintiff is restricted in all manipulative activities, must

13  avoid even moderate exposure to extreme heat and cold, and avoid concentrated exposure to

14  humidity noise and fumes.  (AR 33, 705.)  He must avoid all exposure to hazards.  (AR 33, 705.)

15  He would miss more than three days of work per month.  (AR 33, 705.)

16       The ALJ gave little weight to Dr. Possner's opinion because it proposed significant

17  limitations without any accompanying narration to explain and support his findings.  (AR 33.)

18  Plaintiff does not challenge that the findings the ALJ made are in error, but contends that there is

19  other evidence to support the additional limitations opined by Dr. Possner.  But, "the key

20  question is not whether there is substantial evidence that could support a finding of disability, but

21  whether there is substantial evidence to support the Commissioner's actual finding that claimant

22  is not disabled." Jamerson v. Chater, 112 F.3d 1064, 1067 (9th Cir. 1997).

23       The ALJ considered the January 20, 2015 examination findings of Dr. Siekerkotte's

24  comprehensive internal medicine evaluation.  (AR 32, 465-469.)  On examination, Plaintiff had

25  an awkward gait with legs giving in with each step.  (AR 32, 467.)  He had sort of a waddling

26  gait throwing his legs forward from under his pelvis.  (AR 32, 467.)  He was unable to stand on

27  toes, heels, or on one leg alone.  (AR 32, 467.)  Plaintiff did not use any assistive device to

28  ambulate.  (AR 32, 467.)  Range of motion testing found both legs to be very stiff with active

26

and passive examination. (AR 32, 467.) Ankle joint range of motion was overall decreased in all directions bilaterally. (AR 32, 467.) Seated straight leg raise tests were negative but there was a lot of resistance and stiffness and it was not possible to completely extend Plaintiff's knees passively. (AR 32, .468.) In the supine position, with elevation or flexion of the hips with extended knees, the knees folded about halfway through on each side. (AR 32, 468.) It was impossible to flex the extended leg in the hips at all. (AR 32, 468.) As general findings, Dr. Siekerkotte noted that Plaintiff's ankles and feet are pointing laterally. (AR 32, 468.) There are pressure points on the metatarsal joints and over the great toes bilaterally with lots of calluses. (AR 32, 468.) The feet are not only everted but also in slight plantar flexed position at all times. (AR 32, 468.) Plaintiff has hallux valgus on the right more so than the left. (AR 32, 468.) He has abnormally high arches. (AR 32, 468.) Motor strength was 5/5 in all upper and lower extremities except dorsiflexion of the feet bilaterally which was 4/5. (AR 32, 468.) Plaintiff's side was numb to touch. (AR 32, 468.)

The ALJ considered that in April 2016, Plaintiff had an evaluation for ankle foot orthoses and required a custom orthoses to address his medial longitudinal instability and flaccid mid-foot while enabling ankle dorsiflexion. (AR 29, 511, 513.) A May 25, 2016 lumbar MRI found mild degenerative facet joint disease with mild bulging annulus at multiple levels, but no significant central canal stenosis or neural foraminal stenosis. (AR 29, 577.) Plaintiff received cortisone injections in the subtalar joints. (AR 29, 406, 407, 408, 409, 540, 547, 564.)

On August 12, 2017, Plaintiff was treated at a pain management clinic and reported increased low back pain radiating to the bilateral shoulders that was made worse by bending, walking, lifting, increased physical activity, and sitting or standing a long time. (AR 30, 678.) Plaintiff had pain in the lumbar region while flexing anteriorly with lumbar extension and with left and right lateral flexion. (AR 30, 679.) Plaintiff was able to do heel walk and toe walk and straight leg raising tests were negative. (AR 30, 679-680.) Plaintiff's muscle strength was 5/5 in all extremities. (AR 30, 680.)

Plaintiff returned on September 15, 2017, reporting moderate relief from medications. (AR 29, 674.) His examination results were unchanged. (AR 30, 675-676.)

1        Plaintiff was seen again on October 18, 2017, and palpation of his spine revealed left side

2  pain at L4-L5 and L5-S1.  (AR 30, 671.)  Plaintiff had a slow gait and was unable to heel walk or

3  toe walk.  (AR 30, 671.)  Straight leg testing was positive bilaterally.  (AR 30, 671.)  Plaintiff

4  had decreased sensation to light touch and pin prick in the bilateral lower extremities.  (AR 30,

5  671.)  He was provided with pain medication and steroid injections were recommended, but there

6  is no evidence that Plaintiff had the recommended injections or returned to the pain clinic.  (AR

7  30, 672.)

8        Plaintiff began seeing Dr. Posner in June 2018.  (AR 30, 380.)  He reported that his

9  chronic foot pain was controlled by Norco.  (AR 30, 380.)  His pain was worse with ambulation

10  or weight bearing and at night interfered with his sleep.  (AR 30, 380.)  He had been on his feet

11  more since he moved back to California as he was trying to help his family on their ranch.  (AR

12  30, 380.)

13        On July 27, 2018, Plaintiff reported to Dr. Possner that he was having bilateral hand pain

14  and weakness and certain activities were harder for him, such as opening a jar.  (AR 30, 418.)

15  This was a new change as he had been able to do activities such as playing a guitar without any

16  issues.  (AR 30, 418.)  On examination, Plaintiff was found to have 5/5 grip strength, bilaterally,

17  and normal upper extremity strength.  (AR 30, 418.)

18        At physical therapy a few days later, Plaintiff reported that he was feeling pretty tight

19  after doing a lot at the ranch over the weekend.  (AR 30, 663.)  Plaintiff reported that prior to

20  June 29, 2018, he had been able to stand for an hour or so and since that date was having

21  significant pain after only two minutes of standing.  (AR 30, 663.)

22        Plaintiff had an MRI of his cervical spine on August 9, 2018, that showed a small left

23  paracentral disc protrusion at C6-C7 and mild disc bulging at C4-C5.  (AR 30, 384.)  On August

24  14, 2018, Plaintiff complained of ongoing hand numbness and weakness when he was doing

25  repetitive activities.  (AR 30-31, 415.)  Plaintiff's symptoms were stable and the record notes that

26  the MRI did not show anything that would clearly cause this.  (AR 31, 415.)  Plaintiff's pain was

27  not reproduced with Phalen's or Tinel's maneuvers.  (AR 31, 415.)

28        Physical therapy notes from September 2018 indicate that Plaintiff was receiving good

1   results with improved pliability and gait kinetics.  (AR 31, 662.)  Plaintiff was seen on

2   November 6, 2018, and reported that the people he was staying with did not want him to use

3   Norco, so he had not taken the medication.  (AR 31, 649.)  He reported having a headache that

4   had lasted eight days.  (AR 31, 649.)

5   A November 2018 electromyography study of his upper extremities found moderate

6   nerve entrapment on the right.  (AR 31, 667.)  While findings on the left were normal, the doctor

7   stated Plaintiff was likely experiencing carpal tunnel on the left as well.  (AR 31, 667.)  On

8   November 30, 2018, Dr. Possner referred Plaintiff to orthopedics for his carpal tunnel and

9   physical therapy for his headaches.  (AR 31, 646-647.)  He was also prescribed a wheelchair as

10   walking was quite difficult/painful.  (AR 31, 647.)

11   Here, Dr. Possner's opinion stated that the findings that supported his opined limitations

12   were spina bifida, spastic paraparesis, and partial parallelization from the waist down.  (AR 705.)

13   The ALJ considered that Dr. Posner's opinion that Plaintiff had limitations in handling,

14   fingering, and feeling appeared to be based on Plaintiff's carpal tunnel syndrome.  (AR 33, 705.)

15   The ALJ noted that the manipulative restrictions were presumably based on the Plaintiff's carpal

16   tunnel syndrome, but Plaintiff testified that he was recovering well from carpal tunnel surgery

17   and was not prescribed physical therapy.  (AR 33, 67.)  The ALJ found that the records do not

18   support a finding that Plaintiff's upper extremity limitations have lasted or are likely to last at

19   least 12 months.  (AR 33.)

20   Plaintiff does not challenge the finding that his carpal tunnel did not meet the durational

21   requirements under the Act nor does he argue that the manipulative limitations were based upon

22   his impairments that were found to be severe and has therefore waived any challenge to the

23   ALJ's finding.  Ghanim v. Colvin, 763 F.3d 1154, 1165 (9th Cir. 2014).  However, even had he

24   done so significant evidence supports the ALJ's finding that his carpal tunnel syndrome did not

25   meet the durational requirement.  Plaintiff first complained of hand issues on July 27, 2018,

26   indicating that it was a new problem that had recently developed.  (AR 418.)  He had his carpal

27   tunnel surgery prior to the March 2019 hearing and had been released by his physician because

28   he was healing well and no physical therapy was needed.  (AR 68.)

1    Further, the ALJ found that Dr. Possner's medical records do not support or explain

2    limitations such as the need to change positions every five minutes; the need to lie down several

3    times per day; the need to avoid all exposure to extreme temperatures, and concentrated exposure

4    to humidity, noise, and fumes; and Plaintiff's need to miss more than three days per month.  (AR

5    33.)  Generally, other than noting that Plaintiff has an antalgic gait and significant deformities of

6    the bilateral fee and toes, Dr. Possner's medical records do not contain any objective findings to

7    support the limitations opined.  (AR 380, 415, 418, 647, 652.)  The ALJ need not accept the

8    opinion of any physician that is brief, conclusory, and unsupported by clinical findings.  Thomas,

9    278 F.3d at 957.

10    The ALJ also considered that Dr. Possner's records indicate that Plaintiff was prescribed

11    a wheelchair in November 2018.  (AR 33.)  However, at the hearing Plaintiff was not using a

12    wheelchair and did not indicate that he believed he needed one.  (AR 33.)  Finally, the ALJ

13    found that Dr. Possner's finding that Plaintiff was unable to sit for even two hours in a workday

14    is not consistent with any of the evidence in the medical record, with Plaintiff's testimony that he

15    was driven 13 hours to Colorado in a single day, or with Plaintiff's extended sitting at the

16    hearing.  (AR 33.)

17    The ALJ found that Dr. Possner's opinion was not supported and was inconsistent with

18    the substantial evidence in the record.  Substantial evidence supports the ALJ's finding and

19    therefore, Dr. Possner's opinion was not entitled to controlling weight.  The ALJ provided

20    specific and legitimate reasons to reject the findings of Dr. Possner.

21         2.    Dr. Siekerkotte

22    Plaintiff argues that the ALJ erred by failing to credit certain findings of Dr. Siekerkotte.

23    Plaintiff contends that the ALJ ignored Dr. Siekerkotte's opinions that he could stand and walk

24    less than two hours and that he needs a cane or wheelchair which would support a finding of

25    disability.[5]

---

26    [5] The Court notes that the ALJ presented a hypothetical of an individual who could walk and/or stand less than two
      hours and the VE opined that this individual would be able to perform Plaintiff's previous work activity.  Nor has

27    Plaintiff articulated why use of a cane would require a finding that he is disabled.  As discussed above, to meet a
      listing requires the use of an assistive device, such as a walker, two crutches, or two canes.

28

1        As discussed above the ALJ considered Dr. Siekerkotte's examination findings.  (AR 32.)

2  The ALJ then considered that Dr. Siekerkotte opined that Plaintiff could stand and walk for less

3  than two hours based on the abnormalities of the legs, the positioning of the toes, legs, and

4  ankles, the strongly decreased range of motion of the lower extremities, and balance problems.

5  (AR 32, 468.)  Plaintiff had no sitting limitations. (AR 32, 468.)  Dr. Siekerkotte noted that

6  Plaintiff might try a cane to assist with balance but he stated that he did not want to.[6]  (AR 32,

7  469.)  She opined that Plaintiff could lift less than 10 pounds frequently and occasionally.  (AR

8  32, 469.)  He could never climb ladders and all other postural limitations were occasional.  (AR

9  32, 469.)  Plaintiff could perform all manipulative activities frequently in the seated position

10  only.  (AR 32, 469.)  He could not work at heights or with heavy machinery.  (AR 32, 469.)

11        The ALJ gave some weight to Dr. Siekerkotte's opinion finding that her postural and

12  environmental limitations and the lack of sitting limitations were supported by her examination

13  findings and the overall record.  (AR 32.)  The ALJ was presented with conflicting opinions on

14  Plaintiff's functional capacity and she was to resolve these conflicts in the evidence.  "It is not

15  necessary to agree with everything an expert witness says in order to hold that his testimony

16  contains 'substantial evidence.' "   Magallanes v. Bowen, 881 F.2d 747, 753 (9th Cir. 1989)

17  (citations omitted).  The ALJ could properly accept some of the limitations opined by Dr.

18  Siekerkotte and reject other limitations as long as she provided specific and legitimate reasons to

19  do so.

20        Here, the ALJ found that Dr. Siekerkotte's 2015 recommendation that Plaintiff was

21  limited to less than two hours of standing or walking in a workday was inconsistent with his

22  ability to help out around his family ranch and his statement in 2018 that he was able to stand for

23  an hour.  (AR 32, 380, 663.)  The ALJ found Plaintiff's stated activities indicate that he is

24  capable of standing and walking for two hours in a workday.  (AR 32.)  Inconsistency with

25  Plaintiff's daily activities is a specific and legitimate reason to reject a physician opinion.  See

---

[6] To the extent that Plaintiff contends that Dr. Siekerkotte opined that Plaintiff required a cane to ambulate the record does not support such.  Dr. Siekerkotte stated, "Possibly the claimant might try a cane to help him with balance, however he states that he does not want to."  (AR 469.)  The recommendation that Plaintiff might try a cane to see if it helps with his balance does not lead to the reasonable inference that he requires a cane to ambulate.

1  Ghanim, 763 F.3d at 1162 (inconsistencies between opined limitations and claimant's daily

2  activities may justify rejecting physician opinion); Morgan, 169 F.3d at 600–02 (inconsistency

3  with claimant's reported activities).

4      The ALJ also found that Dr. Siekerkotte's opinion that Plaintiff was limited to only

5  frequent manipulative activities as based on her lower extremity findings was not supported by

6  her findings.  (AR 32.)  She opined that Plaintiff's maximum lifting and carrying capacity was

7  less than 10 pounds both frequently and occasionally based on the above described lower

8  extremity abnormalities and balance problems.  (AR 468.)  She further opined that manipulative

9  activities in the seated position was frequently based on the above described lower extremity

10 findings and balance problems.  (AR 468.)  However, Dr. Siekerkotte did not indicate any

11 abnormalities in the upper extremity examination, and noted that dorsiflexion of the feet

12 bilaterally was 4/5, but otherwise motor strength in the upper and lower extremities was 5/5.

13 (AR 32, 468.)  Internal inconsistences within a physician's opinion constitutes a legitimate basis

14 for rejecting the opinion.  Morgan, 169 F.3d at 603.

15     The ALJ provided specific and legitimate reasons to reject the opinion of Dr. Siekerkotte

16 that are supported by substantial evidence in the record.

17          **F.      Residual Functional Capacity Assessment**

18     Plaintiff argues that the residual functional capacity assessment does not include his

19 mental impairments because his GAF scores signify significant impairment, his treatment

20 records note serious problems with depression and stress, and the ALJ improperly rejected the

21 opinion of Dr. Nikkel.

22     A claimant's RFC is "the most [the claimant] can still do despite [his] limitations."  20

23 C.F.R. § 416.945(a)(1).  The RFC is "based on all the relevant evidence in [the] case record."  20

24 C.F.R. § 416.945(a)(1).  "The ALJ must consider a claimant's physical and mental abilities, §

25 416.920(b) and (c), as well as the total limiting effects caused by medically determinable

26 impairments and the claimant's subjective experiences of pain, § 416.920(e)."  Garrison, 759

27 F.3d at 1011.  At step four the RFC is used to determine if a claimant can do past relevant work

28 and at step five to determine if a claimant can adjust to other work.  Id.  "In order for the

1    testimony of a VE to be considered reliable, the hypothetical posed must include 'all of the

2    claimant's functional limitations, both physical and mental' supported by the record." Thomas,

3    278 F.3d at 956.

4    Plaintiff argues that the record supports that he is unable to walk and stand for two hours

5    in an eight hour day.[7]  In determining Plaintiff's physical functional capacity, the ALJ considered

6    and, as discussed above provided specific and legitimate reasons to reject, the opinions of Drs.

7    Possner and Siekerkotte.  (AR 31-32.)  The ALJ also considered the opinions of the state agency

8    medical consultants Drs. Mitgang, Mauro, and Bugg.  (AR 37.)

9    Dr. Mitgang opined on Plaintiff's residual function capacity during his prior claim for

10   benefits.  (AR 37.)  On February 15, 2015, Dr. Mitgang found that Plaintiff could lift and carry

11   20 pounds occasionally and 10 pounds frequently; stand and walk two hours; sit six hours; rarely

12   push/pull foot controls; and had postural and environmental limitations.  (AR 37, 88-90.)  Dr.

13   Mitgang also opined that Plaintiff had no manipulative limitations.  (AR 89.)  The ALJ gave

14   partial weight to Dr. Mitgang's opinion.  (AR 37.)

15   The ALJ considered that although he was not a treating physician, Dr. Mitgang's

16   assessment was based on a complete review of the available medical record and a comprehensive

17   understanding of the agency rules and regulations.  (AR 37.)  Further, she found that the

18   assessment is internally consistent and well supported by a reasonable explanation of the medical

19   evidence discussed in detail in this decision.  (AR 37.)  However, based on evidence received in

20   the current claim, the ALJ found that Plaintiff has greater restrictions on his ability to lift/carry

21   and that he has some ability to push/pull with his bilateral lower extremities.  (AR 37.)

22   The ALJ gave great weight to the opinion of Dr. Mauro who found that Plaintiff was

23   capable of sedentary work, with occasional pushing/pulling with the lower extremities, as well as

24   postural and environmental limitations.  (AR 37.)  On February 23, 2017, Dr. Mauro considered

25   the current claim on initial review.  (AR 127-128.)  He found that Plaintiff could lift and carry 10

27   [7] As discussed at footnote 5, Plaintiff would be able to perform his prior work if he was limited to standing and/or
28   walking less than 2 hours in an 8 hour workday.  (See AR 75.)  Therefore, this finding, even if erroneous, would be
     harmless error.

pounds occasionally and less than 10 pounds frequently; stand and or walk 2 hours in 8 hour workday; and sit about 6 hours in 8 hour workday.  (AR 127.)  Plaintiff's ability to push/pull was limited in bilateral lower extremities; push/pull with foot controls limited to occasional, with no demand for use of foot controls.  (AR 127.)  Plaintiff could occasionally climb ramps/stairs, stoop, kneel, crouch, crawl.  (AR 127.)  He could never claim ladders, ropes or scaffolds, or balance.  (AR 127-128.)  Plaintiff had no manipulative limitations and must avoid even moderate exposure to hazards.  (AR 128.)  "The weight afforded a non-examining physician's testimony depends 'on the degree to which [he] provide[s] supporting explanations for [his] opinions.' " Garrison, 759 F.3d at 1012 (citations omitted).

Dr. Mauro's opinion states,

MER establishes diagnoses of spastic diplegia with impaired gait; s/p bilateral plantar fasciotomy in 1992 by history pes cavus and other foot deformities documented subsequently; Hypertension without documented evidence of target organ damage.

07/2000 Neurosurgery consult cites prior diagnosis of spastic diplegia with cerebral palsy ruled out but no definitive diagnosis. 4/18/16 Neurology consultant opined the most likely diagnosis to be Hereditary Spastic Paraparesis. It does not appear the claimant pursued genetic testing to confirm the diagnosis. Exam documented BLE distal muscle atrophy with normal strength except ankle dorsiflexion 3/5; plantar flexion 2/5; increased BLE tone; pes cavus and hammertoes.

02/2000 L-spine MRI in file does not document any spinal cord abnormality. Subsequent imaging study documents increased lumbar lordosis and mild loss of disc height.
2/26/16 Xrays documented minimal low thoracic scoliosis, and spina bifida at S1.
5/25/16 MRIs document normal C- & T -spine; L-spine mild multilevel DJD/DDD, small disc protrusion causing mild central stenosis at L5/S1 but no spinal cord abnormality.

In 06/2016, the claimant declined intrathecal baclofen for spasticity. He accepted treatment with oral baclofen but I do not find MER that addresses the response. The claimant received custom molded AFOs in 07/2016.
11/12/16 letter from TP DB Bockoff, MD states the claimant's chronic low back pain is moderately well controlled with regular dosing of oxycodone. Podiatry MER through 10/2016 indicates bilateral foot pain primarily at the sinus tarsi has responded to cortisone injections.

The preponderance of MER indicates there is has been no continuous 12 month period since the AOD during which claimant was not capable of the assessed RFC. There are no material inconsistencies noted in MER or incursions into issues reserved to the Commissioner.

1  (AR 124.)

2      The ALJ also gave great weight to the opinion of state agency consultant, Dr. Bugg, who

3  found that Plaintiff was capable of sedentary work, with occasional pushing/pulling with the

4  bilateral lower extremities as well as postural and environmental limitations.  (AR 37.)  On June

5  22, 2017, Dr. Bugg issued his opinion on reconsideration and concurred with the limitations

6  opined by Dr. Mauro.  (AR 160-162.)

7      Dr. Bugg stated, "C/M with spina bifida, spastic diplegia, chronic foot pain, narcotic

8  analgesics, severe gait disturbance, waddling needs AD for balance.  No evidence of worsening

9  since initial.  Limited to sedentary work, postural/environmental limits."  (AR 157.)

10     The ALJ found that, although they were not treating or examining providers, the opinions

11  of all Drs. Mauro and Buggs were based on a complete review of the available medical record

12  and a comprehensive understanding of the agency rules and regulations.  (AR 37.)  Further, she

13  found that the assessments are internally consistent and well supported by a reasonable

14  explanation of the medical evidence discussed in detail in this decision.  (AR 37.)

15     Plaintiff contends that the ALJ erred by finding that he was able to stand and walk two

16  hours in an eight hour workday.  But the ALJ reasonably found that his ability to stand for one

17  hour and work around his family's ranch was consistent with an ability to walk and stand for two

18  hours in an eight hour day.  (AR 32.)  Plaintiff argues for a different interpretation of the

19  evidence, but the ALJ is to determine credibility, resolve conflicts in testimony, and resolve

20  ambiguities in the evidence.  Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).  "Where

21  evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that

22  must be upheld."  Burch, 400 F.3d at 679.  Here, the ALJ pointed to specific evidence in the

23  record from which she could rationally find that Plaintiff retained the functional capacity to stand

24  and walk for two hours in an eight hour workday.

25     Plaintiff also contends that the ALJ erred because the residual functional capacity

26  presented to the VE did not include his mental limitations.  In assessing how Plaintiff's mental

27  impairments affected his ability to work, the ALJ considered his normal examination findings in

28  the medical record, lack of mental health treatment, and the opinions of consultative examiners,

1  Drs. Nikkel and Schmidt, and state agency physicians, Drs. Brode, Davis, and Torigoe.

2      Plaintiff argues that the ALJ erred by rejecting the GAF scores that indicate a serious

3  impairment due to depression that would preclude work.   The ALJ is not required to give

4  controlling weight to the treating physician's GAF score and failing to mention the GAF score

5  would not render the ALJ's assessment deficient.   Green v. Astrue, No. 5:10-cv-01294-AJW,

6  2011 WL 2785741, at *3 (C.D. Cal. July 15, 2011).   The Ninth Circuit has held in an

7  unpublished opinion that it is not legal error to fail to consider the GAF score where the RFC

8  takes into account the claimant's mental impairments.   McFarland v. Astrue, 288 F.App'x 357,

9  359 (9th Cir. 2008)(unpublished).[8]  "The Commissioner has determined the GAF scale 'does not

10  have a direct correlation to the severity requirements in [the Social Security Administration's]

11  mental disorders listings.' "   McFarland, 288 F.App'x at 359 (quoting 65 Fed.Reg. 50,746,

12  50,765 (Aug. 21, 2000)).   However, GAF scores are relevant and may be considered by the ALJ

13  in considering the claimant's general functional abilities.   Graham v. Astrue, 385 F.App'x 704,

14  706 (9th Cir. 2010).

15      Here, the ALJ did consider the GAF scores in the record.

16      The undersigned gives little weight to the Global Assessment Functioning (GAF)
       scores assigned by various medical professionals.   The claimant was assigned
17      GAF scores ranging from 35 to 49 with the average being around 42 which
       denotes serious symptoms or serious difficulty with social occupational or
18      educational functioning.   [AR 476, 493-497.]   However, GAF scores are only
       estimates of a claimant's current functioning level and do not override
19      longitudinal mental health treatment.   Therefore, the undersigned gives little
       weight to the GAF scores assigned by various medical professionals.
20

21  (AR 37.)

22      The ALJ considered the longitudinal record.   On January 31, 2015, Plaintiff had a

23  consultative examination by Dr. Nikkel.   (AR 32, 472-477.)   Plaintiff reported a steady build up

24  of mental health problems around 2010 or 2011.   (AR 32, 472.)   He complained of depressed

25  mood, anhedonia, weight changes, sleep problems, fatigue, loss of energy, feelings of

26

27  [8] Unpublished dispositions and orders of this Court issued on or after January 1, 2007 may be cited to the courts of
   this circuit in accordance with FRAP 32.1.   Ninth Circuit Rule 36-3(b); see Animal Legal Def. Fund v. Veneman,
   490 F.3d 725, 733 (9th Cir. 2007) ("as of January 1, 2007, we must now allow parties to cite even unpublished
28  dispositions and unpublished orders as persuasive authority").

worthlessness or guilt and thoughts of death.  (AR 32, 472-473.)  He reported that he had been arrested three times for driving under the influence during the prior ten years.  (AR 32, 473.)  He reported a history of substance abuse and that he most recently took Vicodin that was not prescribed to him and used cocaine.  (AR 32, 474.)  His mental examination was within normal limits.  (AR 32, 474-475.)  Plaintiff stated his mood was optimistic and he had a depressed affect.  (AR 32, 475.)  His memory was intact, and concentration was within normal limits.  (AR 32, 475.)  Plaintiff judgment and insight were limited.  (AR 32, 476.)  Dr. Nikkel assessed him with major depressive disorder and a GAF of 49.  (AR 32, 476.)

Dr. Nikkel opined that Plaintiff was capable of managing his own funds.  (AR 477.)  He has the ability to perform simple and repetitive tasks as well as detailed and complex tasks.  (AR 477.)  He has a fair ability to accept instructions from supervisors and interact with co-workers and the public; and is able to perform work activities on a consistent basis without special or additional instruction.  (AR 477.)  Plaintiff has a good ability to maintain regular attendance in the workplace; and a fair ability to complete a normal workday or workweek without interruption from a psychiatric condition.  (AR 477.)  Plaintiff is not able to deal with the usual stress encountered in a competitive workplace due to the current severity of his depression.  (AR 477.)

On August 2, 2015, Plaintiff was brought to the hospital after making suicidal statements.  (AR 31, 480.)  His mental examination was within normal limits.  (AR 31, 477.)  Plaintiff denied suicidal intent and reported that he consumed several shots of alcohol that evening, but his blood alcohol content was extremely high at .0373.  (AR 31, 477, 480.)

On October 9, 2015, Plaintiff complained of chronic depression that had been ongoing for three to four years.  (AR 31, 496.)  Mental status examination showed intense eye contact, a cooperative attitude, depressed mood and a constricted affect, underproductive speech, logical thought processes, normal thought content, average intelligence, normal insight and his judgment was "impaired ability to make reasonable decisions: within normal limits."  (AR 31, 498.)  His GAF was 35.  (AR 31, 497.)  Plaintiff was diagnosed with major depressive disorder, single episode and was prescribed Wellbutrin.  (AR 31, 497.)

On November 4, 2015, Plaintiff reported he was still feeling depressed and there are no

1    mental status findings.  (AR 494.)  Plaintiff was assessed with a GAF of 40.  (AR 31, 494.)

2        On January 22, 2016, Plaintiff continued to report depression, lack of energy and
3    motivation.  (AR 31, 492.)  No mental status examination was done.  (AR 492.)  He was
4    prescribed Trazodone in addition to Wellbutrin.  (AR 31, 492.)

5        On February 13, 2017, Plaintiff had a consultative examination with Dr. Schmidt.  (AR
6    34, 614-623.)  Dr. Schmidt found that Plaintiff's behavior and mood were within normal limits.
7    (AR 34, 614.)  Dr. Schmidt noted that from the onset of their contact, Plaintiff appeared to be
8    actively engaged in impression management, over endorsing typical symptoms of depression, yet
9    offering atypical symptoms as well and frequently and spontaneously diagnosing himself and
10   using the phrase "I don't know" as a means of maintaining control over the depth of the
11   interview investigation.  (AR 34, 614.)  Dr. Schmidt found that Plaintiff presented as guarded
12   rather than actually depressed.  (AR 34, 616.)  On examination, Dr. Schmidt found that Plaintiff
13   appeared intensely negative claiming a victim role of having spina bifida and having lost his
14   fiancé three years prior.  (AR 35, 619.)  He appeared to be editorializing his mental health
15   condition and the severity of his symptoms.  (AR 35, 619.)  Dr. Schmidt did find that Plaintiff
16   had some mild depressive symptoms.  (AR 35, 619.)  He was cooperative with the process, but
17   minimally responsive to questions, especially those that delved into specific detailed
18   information.  (AR 35, 619.)

19       Plaintiff's appearance was unremarkable as was his facial expression.  (AR 35, 619.)
20   Mental activity and speech were within normal limits.  (AR 35, 619.)  When questions appeared
21   to be more specific, seeking measurable information, Plaintiff's speech would adjust accordingly
22   and he would be barely audible.  (AR 35, 619.)  When asked to repeat what he said, he would
23   then return with the phrase, " I don't know", which Dr. Schmidt found suggested an element of
24   guardedness and not a reflection of major depression.  (AR 35, 619.)  Plaintiff's affect was
25   congruent and his mood appeared mildly depressed but not significantly impacting his daily
26   behavior.  (AR 35, 619.)  He showed an appropriate sense of humor that appeared inconsistent
27   with major depression.  (AR 35, 619.)  Plaintiff did not appear overly anxious.  (AR 35, 619.)
28   Plaintiff did not report any fears of being away from home or in public.  (AR 35, 619.)  His

hygiene and presentation were inconsistent with his over endorsement of a major depressive disorder.  (AR 35, 619.)  Dr. Schmidt noted that upon leaving the interview, Plaintiff stood up with a small smile and walked out of the building with a more fluid gait than he had presented at the onset.  (AR 35, 620.)

On examination, Plaintiff's thought content was within normal limits.  (AR 36, 620.) Memory all appeared intact and functional.  (AR 36, 620.)  His fund of knowledge and attention/concentration were within normal limits.  (AR 36, 620.)  Cognitive thinking was intact at least at the concrete level of reasoning.  (AR 36, 620.)  He responded appropriately to conversational banter and demonstrated appropriate social cueing.  (AR 36, 620.)  But Dr. Schmidt noted that Plaintiff was engaged in impression management, attempting to offer symptoms to reflect a depressive disorder as well as editorializing his level of functioning and coping.  (AR 36, 620.)

Plaintiff demonstrated good abstract thinking and grasp of insight which is often lacking in people with a major depressive disorder.  (AR 36, 621.)  His responses to questions testing judgment and insight suggested a below average response style, possibly due to a narcissistic orientation.  (AR 36, 621.)  Primary diagnoses included drug-related disorder with features of depression and depressive disorder due to medical condition and past illicit drug usage.  A secondary diagnosis was personality disorder unspecified features of narcissism.  (AR 36, 621.) Dr. Schmidt opined that Plaintiff's functional level appeared adequate with no significant mental health impairment.  (AR 36, 621.)

Dr. Schmidt opined that Plaintiff was capable of managing his own daily financial affairs. (AR 622.)  His ability to perform simple and repetitive tasks, to perform detailed and complex tasks, and to accept instructions from supervisors is unimpaired.  (AR 621.)  Plaintiff's ability to interact with coworkers and the public and to maintain regular attendance in the workplace is mildly impaired.  (AR 621.)  His ability perform work activities on a consistent basis and to complete a normal workday/workweek without interruptions is mild to moderately impaired. (AR 622.)  His ability to deal with the usual stress encountered in the workplace is moderately impaired.  (AR 623.)

1    On August 12, 2017, Plaintiff reported dependence on others for activities of daily living,

2  non-restful sleep, difficulty staying asleep due to pain, feeling blue all the time, being unable to

3  fall asleep and to stay asleep, frustration because of pain, and that he wakes up due to pain at

4  night.  (AR 30, 678.)  On examination he was alert and oriented, recent memory was intact, and

5  mood and affect were normal  (AR 30, 679.)

6    At examination on June 15, 2018, Plaintiff reported that his pain interfered with his sleep.

7  (AR 30, 380.)  His PHQ9 score was 11, indicating mild to moderate depression.  (AR 30, 380.)

8  Mental examination notes intact memory, judgment and insight and normal mood and affect.

9  (AR 30, 380.)

10    Plaintiff had a normal mental status examination on November 6, 2018.[9]  (AR 31.)

11    Substantial evidence supports the ALJ's findings that the longitudinal mental health

12  treatment does not support the GAF scores in the record.

13    Plaintiff makes a general statement that the treatment notes in the record support that he

14  had a serious problem with depression and stress.  He references Dr. Nikkel's consultative

15  evaluation and three records from Dr. Goklaney.  Plaintiff first saw Dr. Goklaney on October 9,

16  2015, and reported that he had been depressed for a few years, was now worse, and was fatigued

17  all the time with no energy.  (AR 496.)  Dr. Goklaney found that Plaintiff's appearance was

18  within normal limits.  (AR 498.)  His posture and eye contact were intense and activity was

19  slowed.  (AR 498.)  Plaintiff was cooperative with a depressed mood and constricted affect.  (AR

20  498.)  His speech was under productive, but thought process was logical and perception and

21  insight were within normal limits.  (AR 498.)  The record notes, "Impaired ability to make

22  reasonable decisions: Within normal limits."  (AR 498.)  Plaintiff was prescribed Wellbutrin.

23  (AR 498.)

24    Dr. Goklaney saw Plaintiff again on November 4, 2015, and January 22, 2016, and

25  Plaintiff reported feeling depressed and having decreased sleep.  (AR 492, 494.)  The records

26  note that no mental status examination was necessary.  (AR 492, 494.)

27

28  [9] The opinion states the visit was in September 2018, but the record referenced is the November 8, 2018 visit with
Dr. Possner.  (AR 649.)

1    The ALJ considered these records but also that the subsequent medical record
2    demonstrated that Plaintiff did not seek mental health treatment, he took his medication only on
3    an as needed basis, and his mental examinations were relatively normal.  (AR 30, 31-32, 33-34.)
4    Substantial evidence in the record supports these findings.  Plaintiff told Dr. Schmidt that he had
5    been taking Wellbutrin for over a year but only takes it on as needed basis.  (AR 615.)  The
6    Court does not find, nor does Plaintiff point to any other mental health treatment records in the
7    record.  Further, review of the record demonstrates that the mental status examinations in the
8    record are largely normal.  (AR 380, 393, 411, 480, 484, 533, 548, 551, 554, 560, 564, 566, 573,
9    646, 649, 671, 675, 679, 690, 730.)

10    Finally, Plaintiff contends that the ALJ improperly rejected the opinion of Dr. Nikkel
11    finding that it was based on his subjective symptom testimony.  The ALJ found that Plaintiff told
12    Dr. Nikkel that his mood was optimistic, his attitude was cooperative, and he performed well on
13    most cognitive testing.  (AR 34.)  The ALJ noted that while Plaintiff described symptoms of
14    depression, he also indicated that he was not in treatment and had never received treatment for
15    his mental symptoms.  (AR 34.)  The ALJ found that Plaintiff's statements and his lack of
16    treatment do not support Dr. Nikkel's opinion that he is not able to deal with workplace stress
17    due to the severity of his depression.  (AR 34.)

18    Dr. Nikkel found that Plaintiff's symptoms were severe, but as the ALJ noted he had a
19    generally normal mental status examination.  Given the lack of any longitudinal mental health
20    treatment records and the generally normal examination findings during her examination, the
21    ALJ could reasonably infer that Dr. Nikkel's opinion regarding Plaintiff's inability to deal with
22    stress due to the severity of his symptoms was based upon Plaintiff's symptom testimony.  An
23    ALJ can reject a physician's opinion that is premised on a claimant's subjective complaints that
24    have been properly discounted.  Fair, 885 F.2d at 605.

25    The ALJ also considered the opinion of agency physician, Dr. Brode, who found that
26    Plaintiff had no mental impairments.  (AR 37.)  On February 13, 2015, Dr. Brode reviewed the
27    record, including Dr. Nikkel's consultative examination, and found that Plaintiff had mild
28    limitations in all functional areas and no repeated episodes of decompensation.  (AR 87.)  Dr.

1    Brode considered that Plaintiff had a history of working as a loan officer.  (AR 87.)  He assessed

2    depression secondary to pain and loss of mobility caused by physical concerns.  (AR 87.)

3    Plaintiff had a minimal history of treatment.  (AR 87.)  He attended the consultative examination

4    on January 31, 2015, with Dr. Nikkel where he describes a history of drug abuse although denies

5    it is a current issue.  (AR 87.)  His mental status examination was quite mild with depressed

6    affect despite optimistic mood.  (AR 87.)  Cognitively he was grossly intact.  Dr. Brode found

7    Dr. Nikkel's opinion to be somewhat vague with fair to good abilities.  (AR 87.)  Dr. Brode

8    found that Plaintiff's mental impairment was non-severe.  (AR 87.)  The ALJ gave great weight

9    to the opinion of Dr. Brode finding it consistent and well supported by a reasonable explanation

10   of the medical evidence, including Plaintiff's limited mental health treatment and Dr. Schmidt's

11   opinion.  (AR 37.)

12          As discussed above, the ALJ considered and gave great weight to the February 13, 2017

13   opinion of Dr. Schmidt.  (AR 37.)

14          The ALJ also considered the March 13, 2017 opinion of Dr. Davis who reviewed the

15   record on reconsideration and agreed that Plaintiff did not have a severe mental impairment.

16   (AR 37, 126.)  Dr. Davis considered the record and found that Plaintiff had been found to be

17   mildly depressed and to over endorse his chronic physical pain.  (AR 125.)  Plaintiff had been

18   hospitalized after reporting suicidal ideation, but it was noted that he reported that he said stupid

19   stuff because he had been drinking at the time.  (AR 126.)  Plaintiff was recently seen as mildly

20   depressed.  (AR 126.)  Dr. Davis opined that Plaintiff's mental impairment was not severe.  (AR

21   126.)

22          Substantial evidence in the record supports the ALJ's finding that Plaintiff did not have

23   any mental limitations affecting his ability to perform work activities.  The Court finds that

24   hypothetical presented to the VE included Plaintiff's physical and mental limitations and the ALJ

25   did not err.[10]

---

26   [10] Citing to Hoopai v. Astrue, 499 F.3d 1071 (9th Cir. 2007), Defendant argues that even if the ALJ erred by failing
27   to include moderate mental limitations in Plaintiff's residual functional capacity it would be harmless error as the
     ALJ could have relied on the Grids to find Plaintiff not disabled.  The Hoopai court explained:

28          To assist in the step-five determination, the Social Security Administration established the

# V.

## CONCLUSION AND ORDER

Based on the foregoing, the Court finds that the ALJ did not err by findings Plaintiff's symptom testimony not credible, determining that Plaintiff's impairments did not equal a listing, rejecting the opinions of Drs. Nikkel and Possner, or by failing to further develop the record, there is evidence in the record to support the residual function capacity assessment; and any error in failing to find Plaintiff's depression a severe impairment at step two was harmless. Accordingly, IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the Commissioner of Social Security is DENIED.  It is FURTHER ORDERED that judgment be entered in favor of Defendant Commissioner of Social Security and against Plaintiff Adam J. Nelson.  The Clerk of the Court is directed to CLOSE this action.

IT IS SO ORDERED.

Dated:   **October 5, 2020**

UNITED STATES MAGISTRATE JUDGE

---

Medical–Vocational Guidelines (the grids), which "consist of a matrix of [the four factors] and set forth rules that identify whether jobs requiring a specific combination of these factors exist in significant numbers in the national economy."  Heckler v. Campbell, 461 U.S. 458, 461–62, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983).  When the grids match the claimant's qualifications, "the guidelines direct a conclusion as to whether work exists that the claimant could perform." Id. at 462, 103 S.Ct. 1952. When the grids do not match the claimant's qualifications, the ALJ can either (1) use the grids as a framework and make a determination of what work exists that the claimant can perform, see Soc. Sec. Ruling 83–14, 1983 WL 31254 (S.S.A.), or (2) rely on a vocational expert when the claimant has significant non-exertional limitations.  Desrosiers v. Sec'y of Health and Human Servs., 846 F.2d 573, 577 (9th Cir. 1988).

Hoopai, 499 F.3d at 1075.  When a non-exertional limitation is alleged, the ALJ can use the grids without vocational expert testimony because the grids "provide for the evaluation of claimants asserting both exertional and non-exertional limitations." Id. (quoting Razey v. Heckler, 785 F.2d 1426, 1430 (9th Cir. 1986)). However, the grids are inapplicable "[w]hen a claimant's non-exertional limitations are 'sufficiently severe' so as to significantly limit the range of work permitted by the claimant's exertional limitations."  Hoopai, 499 F.3d at 1075 (quoting Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988)).

Defendant contends that use of the Grid Rule 201.27 would require a finding that Plaintiff is not disabled.  Although Dr. Schmidt found that Plaintiff had mild to moderate limitations, he also found that Plaintiff was only mildly depressed and was engaged in impression management and over endorsing his symptoms.  Plaintiff has not argued that Dr. Schmidt's opinion is inconsistent with the RFC nor responded to Defendant's argument.  The Court declines to address the issue having found that Plaintiff did not establish that the ALJ erred in assessing his mental impairment.